DowNet, Judge,
delivered the opinion of the court.
The plaintiff sues in this case for alleged underpayments on certain shipments of freights for the United States in the years 1898 and 1899. The freight movements in question were over the Southern Bailway Co. and the Florida Central & Peninsular Bailroad, some of them originating on the former road and terminating on the latter, and some entirely over the lines of the latter road. In all cases the Florida Central & Peninsular Bailroad Co. was either the sole or the final carrier. ■ In no case was the plaintiff herein the carrier. Such payments as were made, for all the shipments herein involved, were made to the Florida Central & Peninsular Bailroad Co. on vouchers stating the amount due on account of each shipment and on which there was paid the full amount thereon shown to be due and which were receipted, in full, by the proper officer of the Florida Central & Peninsular Bailroad Co. The claim is on account of the deduction, from the various shipments, of certain cars or weights, which were indicated as baggage allowance for the troops of the United States, in connection with the transportation of which said freight movements occurred, on the basis of 150 pounds for each man transported, and also because of alleged misapplication of classifications and rates in the settlements made. The bills of lading, in each instance, were prepared by the defendant’s quartermaster at the point of origin of the shipment, enumerated the cars and the contents thereof involved in the shipments, and were signed, in each instance, by the agent of the initial carrier. At the point of destination they were receipted by the proper quartermaster of the defendant.
The first question which is presented in this case is upon the right of the plaintiff to maintain the action. The ground for the objection assigned is that the plaintiff sues to recover an alleged balance of a claim which if it ever had a legal *111 status belonged to the Florida Central & Peninsular Railroad Co.
The undisputed facts are that the Florida corporation, so called herein for brevity’s sake, engaged in the movements of troops and property of the United States during the period of their movements during and at the end of the Spanish-American War. That company was a railroad corporation under the laws of Georgia and Florida. Its lines of road extended from Savannah on the north to points in Florida.
The Seaboard Air Line Railway was a railroad corporation originally chartered in Virginia, but by duly authorized consolidations or mergers with roads in other States had become a consolidated corporation under the laws of Virginia, North and South Carolina, Georgia, and Alabama. In 1903 the Seaboard company, so called for brevity, as consolidated as last above stated, and the said Florida corporation, both acting by and through their respective officers and by concurrence of their stockholders, entered into an agreement looking to their consolidation into a corporation under the name of the Seaboard Air Line Railway, and the agreement was carried into effect. The law of Georgia (sec. 2173, Code of Georgia, 1895) authorizes a railroad company which has constructed a railroad in said State or any other State to make contract with any other railroad company “ that will enable said company to run their roads in connection with each other and to merge their stocks or to consolidate with any such company within or without this State, or to lease or purchase the property of any other such company, and hold, use, and occupy the same in such manner as they may deem most beneficial to their interest.”
Section 2812 of the general statutes of the State of Florida contains a similar provision to that above quoted from the Code of Georgia.
The agreement between said two companies provides and declares that “the capital stock, franchises, railroads, estates, and properties, real, personal, and mixed, of the Florida Central & Peninsular Railroad Co. shall be, and they are hereby, united, merged, and consolidated with the Seaboard Air Line Railway and are hereafter to be owned and *112 controlled by one railroad company”; that the consolidated corporation shall have preferred and common stock; that the holders of the preferred stock in the Florida corporation should receive one share of the preferred stock and one share of the common stock of the consolidated company for each share of preferred stock in the Florida corporation held by them and one share of the common stock of the consolidated company for each share of common stock held by them in the Florida corporation, and that the stockholders in the Seaboard company should receive share for, share, whether of preferred or common stock, held in the Seaboard company.
Provision is made for the issue by the consolidated company of its own capital stock in amount exceeding that necessary to take up the shares of stock issued and outstanding by said two companies, and also for the issue by the consolidated company of bonds to the amount of $100,000,-000, to be secured by a mortgage or deed of trust upon the properties of the consolidated company.
It is also provided in the agreement that upon the ratification of the same by the stockholders of the constituent companies the rights, privileges, and franchises' of each of the constituent companies and all the property, real, personal, and mixed, and all debts due on every account as well as stock subscriptions and other things in action belonging to each of said companies, shall be transferred to and vested in the consolidated company without further act or deed.
While the agreement speaks of a merger and consolidation, the name by which the transaction is called is not determinative. The power given by statute was to merge or to consolidate or the purchase of one road by the other. The effect of what was accomplished by the agreement and the manifest intention of the parties to the agreement was the creation of a corporation — -a legal entity distinct from eithei of the corporations entering into the agreement. The contract between them speaks of the two “ former ” companies and of the new or consolidated corporation.
We have no doubt that a new corporation was formed, to which was transferred and assigned the franchises, rights, and properties of each of the former companies. Yazoo & *113 Mississippi Ry. Co. v. Adams, 180 U. S., 1, 18; Railroad Co. v. Georgia, 98 U. S., 359.
In legal effect the transaction is not different from a purchase by the new corporation of the railroads and properties of the two former companies, so far as the right to collect the debts or claims of either of the former companies is concerned. Nor would there be any difficulty in the new company suing for the recovery of debts due the former companies in the absence of a statute such as section 3477 of the Eevised Statutes. That statute forbids assignments of claims against the United States.
Section 3477 of the Eevised Statutes has been construed often by this court and by the Supreme Court. One of the latest expressions of the Supreme Court on that question is found in National Bank of Commerce v. Downie, 218 U. S., 345, 353. That case reviews a number of former decisions. Quoting from Spafford v. Kirk, 97 U. S., 484, 488, it approves the following language in that case referring to section 3477:
“It would seem to be impossible to use language more comprehensive than this. It embraces alike legal and equitable assignments. It includes powers of attorney, orders, or other authorities for receiving payment of any such claims, or any part or share thereof. It strikes at every derivative interest, in whatever form acquired, and incapacitates every claimant upon the Government from creating an interest in the claim of any other than himself.”
In Bp of or d v. Airman attempt was made by one of the parties to make a distinction between the validity of an assignment as between the parties and the validity of an assignment so far as the United States were concerned. The court said, p. 490:
“We can not say, when the statute declares all transfers and assignments of the whole of a claim, or any part or interest therein, and all orders, powers of attorney, or other authority for receiving payment of the claim, or any part thereof, shall be absolutely null and void, that they are only partially null and void; that they are valid and effective as between the parties thereto and only invalid when set up against the Government.”
*114 In St. Paul & Duluth R. R. Co. v. United States, 112 U. S., 733, 736, it appeared that a voluntary transfer by mortgage for the security of a debt had been made and that there had been a foreclosure of the mortgage consummated by judicial sale, and it was held that the transfer was within the prohibition of section 3477 of the Revised Statutes. In the opinion by Mr. Justice Matthews it was said: “ If the statute does not apply to such cases, it would be difficult to draw a line of exclusion which leaves any place for the operation of the prohibition.”
It is true that in construing this statute the Supreme Court has held that a transfer by operation of law does not come within the inhibition of that statute. Erwin v. United States, 97 U. S., 382, 397.
In Goodman v. Niblack, 102 U. S., 556, it was held that a voluntary assignment for the benefit of his creditors made by an insolvent debtor of all his effects is not different from an assignment in bankruptcy and is not within the inhibition of the statute.
In Bailey et al v. United States, 109 U. S., 432, it appeared that a power of attorney had been given by the plaintiff and payment had been made to the person holding the duly executed power of attorney. • The plaintiff sued the United States and sought a recovery upon the ground that the payment to the person holding his power of attorney was unauthorized because the power of attorney was itself void under the influence of section 3477. It was held that the plaintiff could not recover, and was said (p. 440) : “ But if the protection of claimants was at all in the mind of Congress when passing the acts of 1846 and 1853, it is quite certain that the courts should not, to the injury of the Government, extend that protection to those that elected not to avail themselves of the provisions of those statutes.” The plaintiff having given a power of attorney, and it being unrevoked, and payment having been made thereunder by the Government, the court would not allow the plaintiff to question the propriety of the payment.
In Price v. Forrest, 173 U. S., 410, it was held that an order made by a judicial tribunal having jurisdiction of the *115 parties appointing a receiver of a claim against the Government and ordering the claimant to assign the same to such receiver, to be held subject to the order of the court for the benefit of those entitled thereto, can not be regarded as prohibited by section 3477. The court in that case recognized the rule announced in United States v. Gillis, 95 U. S., 407; Erwin v. United States, supra; Goodman v. Niblack, supra, and St. Paul & Duluth R. R. Co. v. United States, supra.
Manifestly the transfer of the properties and assets of the Florida railroad to the new corporation was not a transfer by operation of law. The agreement between the two corporations under which a third and distinct organization and corporation arose was entirely voluntary on the part of each of them. The terms and conditions upon which the Florida corporation made the transfer of its assets are fully set forth in the agreement between the two companies, and it was only because of said agreement that any transfer was or could be made.
The facts show that the claims now sought to be enforced by the Seaboard Air Line company were claims which are alleged to have accrued to the Florida corporation in the years 1898 and 1899. Part of a claim now asserted was for transportation which originated on the Southern Eailway, and it appears that that company brought suit and recovered judgment. The items which are involved in this suit concerning the Southern Eailway Co.’s transportation were within the purview of the suit brought by the Southern Eail-way Co., but were not included in its said suit. It is claimed that the Florida company can now maintain the suit for those items because it was the terminal carrier with whom settlement should have been made. As to all of the items of claim, settlements were made with the Florida company during said years or shortly thereafter. Those settlements are sought to be impeached upon the ground that payments made by the Government on account of transportation of troops and property were incorrect in that the Government officials made deductions on account of baggage when, as it is alleged, the amount of baggage for which deductions should have been made was greatly below the weights upon *116 which settlements were made. In other words, that the Government was not pa3dng the Florida company for property transported and which should have been paid for, and on the contrary has treated as baggage large shipments which were not properly baggage. The Florida company received the vouchers issued in pursuance of the settlements made by the accounting officers. It does not appear that the Florida company made any objection to the settlements, and certainly the Florida company never brought any action in this or any other court to correct the alleged errors. The consolidated company, which is the plaintiff in this suit, was not organized until June, 1903, some four years after the alleged errors had been made against the Florida company. This action was brought in this court in April, 1904, and it seeks to recover on account of the alleged errors in settlements made by the accounting officers with the Florida company.
If under the circumstances stated the status of the Seaboard company in this case is not that of an assignee of a claim, it is difficult to define its status. That assignment was not by operation of law but was the case of a voluntary transfer of claims against the United States before their allowance in direct opposition to the statute. One of the mischiefs sought to be prevented by said statute finds illustration in the case at bar, because it appears that the Florida company brought no action, although more than ample time therefor had elapsed, and that a new corporation which acquired its assets is seeking to enforce claims the settlement of which, so far as the record shows, were acquiesced in by the Florida company. One of the mischiefs which the act was intended to remedy was, as stated in Goodman v. Niblack, 102 U. S., 556, 560:
“ That, by a transfer of such a claim against the Government to one or more persons not originally interested in it, the way might be conveniently opened to such improper influences in presenting the claim before the departments, the courts, or the Congress, as desperate cases, when the reward is contingent on success, so often suggests.”
Certainly where a claim is transferred by mortgage, which is subsequently foreclosed, the purchaser does not acquire a *117 right to maintain an action against the United States by virtue of that assignment. St. Paul & Duluth R. R. Co., supra. That being true, how can we say that a voluntary transfer by a corporation of all its assets to another corporation is not an assignment within said section? “We can not say, when the statute declares all transfers and assignments of the whole of a claim, or any part or interest therein, * * * shall be absolutely null and void, that they are only partially null and void.” Spofford v. Kirie, 97 U. S., 484, 490.
The plaintiff insists that in order to question its right to maintain the action the defendants should have pleaded in abatement, and that having failed to so plead or to file any plea the defendants should not now be heard to say that there was an assignment of the claim. The rules of the_ court prescribe that in the event the defendants do not plead within 60 days after suit is brought and notice thereof a general traverse of the petition shall be treated as filed and the case proceed.
The plaintiff relies upon the familiar rule that at common law a plea in bar is a waiver of matter which should be pleaded in abatement.
There are several reasons why the rule invoked by plaintiff should not be applied here. The Court of Claims is not bound by special rule of pleading. District of Columbia v. Barnes, 197 U. S., 146, 154.
This court, in Labadie’s case, 31 C. Cls., 436, considered the question whether a special plea could be filed after the lapse of the 60 days allowed by the statute for the defendants to plead, answer, or demur, unless the time were extended by order of the court, and held that it was a matter of discretion with the court to allow a plea to be subsequently filed.
But if it were conceded that there is an order of pleading in this court the principle urged by plaintiff would not be applicable, because the matter of assignment could be pleaded in bar as well as in abatement. Section 159 of the Judicial Code prescribes what a petition shall contain and requires the averment that no assignment or transfer of the claim has been made. Section 3477 of the Eevised Statutes *118 forbids the assignment of a claim against the United States. The petition in this case does not in terms negative an assignment or transfer of the claim, but in general terms avers a merger of the two corporations and the succession by plaintiff to the rights of the Florida corporation. We have no doubt that the general traverse reaches the question of an assignment. In view of the positive terms of the statute, it would be the duty of the court to take notice of the fact of an assignment or transfer of the claim sued upon, whether brought to its attention by the defendants or not.
The language of the court in National Bank of Commerce v. Downie, 218 U. S., 345, 356, is apposite:
“The present cases are not assignments which by operation of law created an interest in the assignor’s claims against the United States. They are clean-cut cases of a voluntary transfer of claims against the United States before their allowance, in direct opposition to the statute. If any regard whatever is to be had to the intension of Congress, as manifested by its words — too clear, we think, to need construction — we must hold such a transfer to be absolutely null and void, and not in itself passing to the appellants any interest, present or remote, legal or equitable, in the claims transferred.”
The conclusions reached upon the question discussed necessarily determines the right of this plaintiff to maintain this action and requires an adverse judgment.
In our former opinion in this case while announcing the views above suggested as to the right of the plaintiff to maintain the action we went further and discussed the case as presented by the findings of fact. We called attention to the fact that a stipulation which had been made in a number of cases similar to the one at bar (except the question of assignment), and upon which the other cases had been tried, had been withdrawn by the Assistant Attorney General in this case, who declined to be bound by it. We recognized the rule stated by Judge Howry in the case of Jones & Laughlin v. United States, 42 C. Cls., 178, but we also called attention to the fact that the plaintiff had not asked a continuance of the case when the stipulation was withdrawn. That the withdrawal of the stipulation upon which, up to *119 that time, the plaintiff had relied might be a ground of surprise, which would authorize a continuance in order to enable the parties to supply by proof what they thought was proved by the stipulation, we have no doubt. Plaintiff now by a motion for a rehearing asks leave of the court to supply the requisite proof. Some proof has been taken in other cases of a similar kind to this, but that proof was not brought into this case nor was it considered by the court in the original hearing. Some affidavits are filed with plaintiff’s motion for a rehearing, some of which are to the effect that the settlements which were made and which the plaintiff seeks to question, were made by the accounting officers taking the bills of lading with the notations thereon and treating them as accurate exponents of the facts instead of taking the bills presented by the railroad companies themselves. Though the suit was brought in April, 1904, and was not presented to this court for decision until March, 1917, nearly 13 years, we might afford the plaintiff an opportunity of taking additional proof because largely of the surprise to which it was probably put by the withdrawal of said stipulation which affected some but not all of the questions involved in the case. But we are met by the fact that in our opinion plaintiff can not maintain the action because of section 3477 above discussed. And section 165 of the Judicial Code provides: “When it appears to the court in any case that the facts set forth in the petition of the claimant do not furnish any ground for relief, it shall not authorize the taking of any testimony therein.” Holding to the view we do upon the right of the plaintiff to maintain the action we do not feel justified in putting the parties to the expense of taking additional testimony which can not affect the result.
The findings of fact show the case as it was presented on the former hearing, and our former opinion in the case will be withdrawn and this opinion substituted therefor.
For the reasons stated the motion for a rehearing will be overruled. And it is so ordered.
Hay, Judge; Barney, Judge; Booth, Judge, and Campbell, Chief Justice, concur.